IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION


SHERROD GAMBLE,

    Petitioner,

v.

WARDEN, ROSS CORRECTIONAL
INSTITUTION,

    Respondent.

Case No. 2:18-cv-1012
Judge George C. Smith
Chief Magistrate Judge Elizabeth P. Deavers


# REPORT AND RECOMMENDATION

Petitioner, a state prisoner, seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254. (ECF No. 3.) This matter is before the Court on the *Petition* (ECF No. 3), Respondent's *Answer* (ECF No. 6), and the exhibits of the parties. For the reasons that follow, the Magistrate Judge **RECOMMENDS** that the *Petition* be **DENIED**, and that this action be **DISMISSED**.

## Facts and Procedural History

The Court of Appeals for Ohio's Tenth District summarized the relevant facts and procedural history of this case as follows:

> In May 2015, [Petitioner] had been living for a few months on Roosevelt Ave. in Columbus along with his sister S.G., her fiancée K.S., and S.G.'s children, D.R., a 16–year-old male, and Z.G., an 8–year-old female. (Mar. 14–15, 2016 Tr. Vol. 1 at 53–54.) On the evening of May 5, 2015, [Petitioner], K.S., D.R., and Z.G. were at the apartment. (Tr. Vol. 1 at 58–61.) S.G. was working overnight as a home health aide and was not at the apartment. [Petitioner] and K.S. were drinking beer, but initially there were no problems. Between 9:00 and 10:00 p.m., D.R. went to sleep in his bedroom, which was in the basement. (Tr. Vol. 1 at 61.)
>
> . . . Around 3:50 a.m., on May 6, 2015, D.R. was awakened when he heard arguing between [Petitioner] and K.S. on the main floor of the apartment. [Petitioner] and K.S. were not yelling, but their voices were raised, and they were arguing about K.S. waking up [Petitioner]. (Tr. Vol. 1 at 63–64.) D.R. then heard screaming and

K.S. tell [Petitioner] that he would be right back. K.S. then went upstairs, probably to put on shoes, in preparation for fighting. (Tr. Vol. 1 at 64–66.) K.S. then returned to the main floor.

. . . At this point, D.R. had walked up the stairs from the basement and was in the kitchen when he heard three gunshots. (Tr. Vol. 1 at 66.) D.R. went to the living room and saw K.S., who had already been shot three times, next to [Petitioner] who was leaning back against the couch holding a gun to the side of K.S.'s right cheek. (Tr. Vol. 1 at 68–70 & 81–82.) D.R. saw a muzzle flash as appellant shot K.S. in the face, who then fell with his head landing on an ottoman. (Tr. Vol. 1 at 71, 82 & 94.) K.S. told D.R. that he needed help and wanted D.R. to call an ambulance. [Petitioner] told D.R. not to call the ambulance. (Tr. Vol. 1 at 72.)

. . . D.R. saw his younger sister, Z.G., coming down the steps from her upstairs bedroom and told her to go back upstairs. D.R. then left the house and called 911 on his cell phone. (Tr. Vol. 1 at 73–74 & 86.) D.R. told the dispatcher that K.S. had been shot. He then called his mother and went back to the house, where police had already arrived and were talking to Z.G. [Petitioner] had left the house by this time. (Tr. Vol. 1 at 130.) When officers spoke to D.R. he told them that his uncle, [Petitioner], had shot K.S. (Tr. Vol. 1 at 75 & 127–8.) He also identified [Petitioner] as the shooter in the courtroom. (Tr. Vol. 1 at 92.)

. . . Z.G. testified that she heard [Petitioner] and K.S. arguing before she went to bed and, as a result, she went upstairs and shut her bedroom door. (Tr. Vol. 1 at 115.) While she could not pinpoint an exact time, she did testify that she fell asleep after dinner when it was night time. Quite a few hours later, she was awakened by a gunshot. (Tr. Vol. 1 at 107, 115 & 118.) She was on her way downstairs when D.R. told her to go back upstairs. Z.G. initially went back to her bedroom, but then went and sat on the steps. (Tr Vol. 1 at 108.) While sitting on the steps, she saw [Petitioner] walk by her wearing a white t-shirt that resembled a tank top go into the bathroom and change his shirt. (Tr. Vol. 1 at 108–10.) [Petitioner] then left the apartment and did not return. (Tr. Vol. 1 at 113.)

S.G. testified that on May 7, 2015, she found a white tank top with blood on it in the upstairs bathroom, and her sister found a coffee can containing unused bullets in the living room, where [Petitioner] slept. (Tr. Vol. 1 at 149–52.) S.G. testified that she was not aware of, nor did she allow, any guns in her apartment. (Tr. Vol. 1 at 156.)

. . . The tank top was analyzed by the Columbus Police Laboratory and the DNA on the blood swabs were consistent with K.S.'s DNA, i.e., the blood on the t-shirt was from K.S. (Mar. 16, 2016 Tr. Vol. 2 at 260 & 262.) A firearm examiner from the Columbus Police Department testified that a bullet recovered from K.S.'s body and one of the unused bullets from the coffee can were structurally indistinguishable. (Tr. Vol. 2 at 302–08.)

2

Dr. John Somerset of the Franklin County Coroner's Office noted that K.S. was shot four times. K.S. suffered two gunshot wounds to his head, one to his face, and a fatal wound that entered his shoulder, traveled into his chest, and severed a major artery. (Tr. Vol. 2 at 220–21 & 224–33.) The wounds to the head and face were not "immediately fatal." (Tr. Vol. 2 at 221.) Dr. Somerset noted that the last shot, i.e., the one to K.S.'s face that was witnessed by D.R., showed evidence of close-range firing. He opined that the shot was fired from "definitely less than a foot and probably less than six inches" away from K.S. (Tr. Vol. 2 at 230–31.)

. . . [Petitioner] was later arrested and agreed to give a statement. He denied any involvement in the shooting. [Petitioner] claimed that he left the apartment around 9:30 p.m. and went to a neighborhood bar. (Tr. Vol. 2 at 352–53 & 366.) He stated that he remained at that bar until last call at approximately 2:10 a.m., then left the bar and got a ride to his girlfriend's house, arriving between 3:00 and 3:30 a.m. (Tr. Vol. 2 at 353–57.) He stayed there for the remainder of the night.

. . . However, in addition to the positive identification of him by his nephew and niece and the presence of K.S.'s blood on his t-shirt, cell phone records from [Petitioner's] phone revealed that calls from his cell phone were placed to his girlfriend's phone and his brother's phone within minutes of the homicide. (Tr. Vol. 2 at 405–07.) Cell phone tower data showed that, at the date and time of the homicide, [Petitioner's] phone was in the general area of the homicide and was not, at any point, in the area of his girlfriend's apartment. (Tr. Vol. 2 at 413–18.) After that, calls were on towers moving south. [Petitioner's] girlfriend lived to the northwest of the incident site. (Tr. Vol. 2 at 399.)

*State v. Gamble,* No. 16AP–397, 2017 WL 1476305, at * 1–2 (Oh. Ct. App. April 25, 2017).

On June 2, 2015, Petitioner was indicted for one count of aggravated murder in violation of Ohio Rev. Code § 2903.01; one count of murder in violation of Ohio Rev. Code § 2903.02; and one count of having a weapon while under a disability in violation of Ohio Rev. Code § 2923.13. (ECF No. 5, at PAGE ID ## 45–47.) The aggravated murder and the murder counts both carried firearm and repeat violent offender specifications. (*Id.*)

The state appellate court described the procedural history that occurred after the indictment:

At trial, [Petitioner's] counsel orally moved the court for acquittal pursuant to Crim.R. 29, specifically addressing the prior calculation and design element of the aggravated murder count. (Tr. Vol. 2 at 435–38.) The court overruled the motion.

3

. . . On March 18, 2016, after a five-day trial, the jury found [Petitioner] guilty of aggravated murder with specifications, and murder with specifications. The court returned a verdict finding [Petitioner] guilty of having a weapon while under disability. (Jgmt. Entry at 1.)

. . . At a separate sentencing hearing held on April 21, 2016, the aggravated murder and murder counts merged, and the state elected to proceed with sentencing on the aggravated murder count. The court sentenced [Petitioner] to life without possibility of parole for aggravated murder, 36 months on the weapon while under disability charge, 3 years on the gun specification, and 10 years on the RVO specification. (Jgmt. Entry at 2.) . . .

Petitioner appeals and assigns the following errors:

[I.] THE EVIDENCE PRESENTED AT TRIAL WAS INSUFFICIENT TO SUPPORT THE CONVICTIONS.

[II.] THE TRIAL COURT ERRED WHEN IT OVERRULED APPELLANT'S MOTION FOR ACQUITTAL PURSUANT TO CRIMINAL RULE 29.

[III.] THE JURY'S VERDICTS WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

*State v. Gamble,* 2017 WL 1476305, at *2–3. On April 25, 2017, the state appellate court overruled those three assignments of error and affirmed the judgment of the state trial court. *Id.*, at * 7. Although Petitioner sought an appeal of that determination, the Ohio Supreme Court declined to exercise jurisdiction over the matter on September 27, 2017. *State v. Gamble*, 150 Ohio St. 3d 1445, 1445 (Ohio 2017).

4

On August 28, 2018, Petitioner filed his *Petition* by placing it in the prison mailing system. (ECF No. 3, at PAGE ID # 38.)[1] Construing that document liberally, Petitioner appears to allege that there was insufficient evidence to support his conviction. (*Id*., at PAGE ID # 28.) Respondent contends that this claim is without merit.

**Standard of Review**

Because Petitioner seeks habeas relief under § 2254, the Antiterrorism and Effective Death Penalty Act ("the AEDPA") governs this case. The United States Supreme Court has described AEDPA as "a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court" and emphasized that courts must not "lightly conclude that a State's criminal justice system has experienced the 'extreme malfunction' for which federal habeas relief is the remedy." *Burt v. Titlow*, 571 U.S. 12, 20 (2013) (quoting *Harrington v. Richter,* 562 U.S. 86, 102 (2011)); *see also Renico v. Lett*, 559 U.S. 766, 773 (2010) ("AEDPA . . . imposes a highly deferential standard for evaluating state–court rulings, and demands that state–court decisions be given the benefit of the doubt.") (internal quotation marks, citations, and footnote omitted).

The AEDPA limits the federal courts' authority to issue writs of habeas corpus and forbids a federal court from granting habeas relief with respect to a "claim that was adjudicated on the merits in State court proceedings" unless the state-court decision either:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

---

[1] Under the mailbox rule, a *pro se* petition is deemed filed on the date that a petitioner provides it prison authorities for mailing. *See Houston v. Lack*, 487, U.S. 266, 270 (1988).

28 U.S.C. § 2254(d).

The United States Court of Appeals for the Sixth Circuit has explained the meaning of the standards found in § 2254(d)(1) as follows:

> A state court's decision is "contrary to" Supreme Court precedent if (1) "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law[,]" or (2) "the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives" at a different result. *Williams v. Taylor*, 529 U.S. 362, 405, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). A state court's decision is an "unreasonable application" under 28 U.S.C. § 2254(d)(1) if it "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular . . . case" or either unreasonably extends or unreasonably refuses to extend a legal principle from Supreme Court precedent to a new context. *Id.* at 407, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389.

*Coley v. Bagley*, 706 F.3d 741, 748–49 (6th Cir. 2013).

Under § 2254(d)(2), a state court's factual determination is not "unreasonable" merely because the federal habeas court would have reached a different conclusion. *Wood v. Allen*, 558 U.S. 290, 301 (2010). Instead, "[f]actual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding[.]" *Ayers v. Hudson*, 623 F.3d 301, 308 (6th Cir. 2010) (quoting *Miller–El v. Cockrell,* 537 U.S. 322, 340 (2003) ("*Miller–El I*"). A state court's factual findings are therefore "only unreasonable where they are 'rebutted by clear and convincing evidence' and do not have support in the record." *Moritz v. Woods*, No. 16-1504, 2017 WL 2241814, at *5 (6th Cir. May 22, 2017) (*quoting Pouncy v. Palmer*, 846 F.3d 144, 158 (6th Cir. 2017)) (internal quotation marks omitted).

6

The burden of satisfying AEDPA's standards rests with the petitioner. *See Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

**Law and Analysis**

Although not entirely clear, in his sole ground for relief, Petitioner appears to assert that there was insufficient evidence to support the prior calculation and design element of his aggravated murder conviction. (ECF No. 3, at PAGE ID # 28.) As factual support for that claim, he contends that he was attacked in his sleep. (*Id*.) Respondent asserts that this claim is without merit.

In the state appellate court, Petitioner alleged that the state presented no evidence indicative of prior calculation and design, and thus, there was insufficient evidence to support his conviction and that the verdict was against the manifest weight of the evidence. The state appellate court considered both of those claims together and rejected them.

> The aggravated murder statute, R.C. 2903.01(A), states that "[n]o person shall purposely, and with prior calculation and design, cause the death of another." Since the enactment of R.C. 2903.01 in 1974, the Supreme Court of Ohio has repeatedly emphasized that there is no "bright-line test that emphatically distinguishes between the presence or absence of 'prior calculation and design.' Instead, each case turns on the particular facts and evidence presented at trial." *State v. Taylor*, 78 Ohio St.3d 15, 20 (1997); *State v. Braden*, 98 Ohio St.3d 354, 2003–Ohio–1325, ¶ 61; *State v. Maxwell*, 139 Ohio St.3d 12, 2014–Ohio–1019, ¶ 148.
>
> . . . However, courts have looked at numerous factors in analyzing prior calculation and design issues. In *Taylor* at 19, the court looked at three factors: (1) did the accused and victim know each other, and if so, was that relationship strained; (2) did the accused give thought or preparation to choosing the murder weapon or murder site; and (3) was the act drawn out or "an almost instantaneous eruption of events." *Id.*
>
> . . . Additionally, in *State v. Cotton,* 56 Ohio St.2d 8 (1978), and in *State v. Robbins*, 58 Ohio St.2d 74 (1978), the Supreme Court set forth the following syllabus rule:
>
>> Where evidence adduced at trial reveals the presence of sufficient time and opportunity for the planning of an act of homicide to constitute prior calculation, and the circumstances surrounding the

homicide show a scheme designed to implement the calculated decision to kill, a finding by the trier of fact of prior calculation and design is justified.

In *Robbins*, the Supreme Court found sufficient evidence of prior calculation and design when the defendant assaulted the victim in an apartment hallway, went into his own apartment, retrieved a sword, and then "instants later" stabbed the victim fatally. *Id.* at 79. *See State v. Bailey*, 90 Ohio App.3d 58, 73 (11th Dist.1992) (prolonged thought process not required; under *Robbins*, evidence sufficient when defendant had only "instants" to design death). *See also State v. Small*, 10th Dist. No. 06AP–1110, 2007–Ohio–6771, ¶ 11.

. . . While "prior calculation and design" requires something more than instantaneous deliberation, it does not require a drawn-out thought process. *See Cotton* at 11. No particular time frame is necessary. *Taylor* at 22. A finding of prior calculation and design has been upheld even though the defendant's actions took only "a minute or two." *State v. D'Ambrosio*, 67 Ohio St.3d 185, 196 (1993). "[P]rior calculation and design can be found even when the killer quickly conceived and executed the plan to kill within a few minutes," *State v. Coley*, 93 Ohio St.3d 253, 264 (2001), as long as the killer's actions "went beyond a momentary impulse and show that he was determined to complete a specific course of action," *State v. Conway*, 108 Ohio St.3d 214, 2006–Ohio–791, ¶ 46; *Small* at ¶ 12.

. . . Firing multiple gunshots at close range at the victim's head demonstrates that defendant "engaged in more than a mere 'instantaneous deliberation' " with respect to the victim's death. *State v. Palmer*, 80 Ohio St.3d 543, 569 (1997); *State v. Carson*, 10th Dist. No. 05AP–13, 2006–Ohio–2440, ¶ 24–27 (sufficient evidence of prior calculation and design where victim and defendant knew each other, argued, before defendant shot victim first in the head then three or four more times). Additionally, execution-style slayings bespeak calculation and design. *State v. Campbell*, 90 Ohio St.3d 320, 330 (2000); *State v. Trewartha*, 165 Ohio App.3d 91, 2005–Ohio–5697, ¶ 33 (10th Dist.). In *State v. Goodwin*, 84 Ohio St.3d 331, 344 (1999), the Supreme Court found sufficient evidence of prior calculation and design where the defendant placed his gun to the forehead of the unresisting victim, and pulled the trigger, killing the victim instantly. *See Small* at ¶ 16.

. . . The Supreme Court has recently addressed the issues related to the prior calculation and design requirements in the aggravated murder statute in *State v. Walker*, ––– Ohio St. –––––, 2016–Ohio–8295. In *Walker*, the Supreme Court stated that:

> We accepted this discretionary appeal by the state of Ohio from a judgment of the Eighth District Court of Appeals that reversed a conviction of aggravated murder because it was not supported by sufficient evidence of prior calculation and design. During a bar fight, Dajhon Walker knowingly killed Antwon Shannon, and for

> that act Walker was properly convicted of felony murder under R.C. 2903.02(B). But the evidence did not show that this killing was done with prior calculation and design as required to sustain a conviction for aggravated murder. The elements of purpose and of prior calculation and design are distinct, and the state must prove both to support a conviction of aggravated murder under R.C. 2903.01.
>
> We therefore affirm the judgment of the court of appeals.
>
> *Id.* at ¶ 1–2.

. . . In *Walker*, the facts show that two groups of people were fighting in a bar. Walker joined in, hitting Shannon (the victim) and throwing a bottle at him. Walker then hopped backwards, grabbing at his waistband, hunched over, and moved to the side. Shannon moved away from the fight. Walker went out of view to the corner of the room behind a pillar. The video footage shows a gunshot flash a few seconds later with everyone in the club scattering. Walker appeared from the other side of the pillar fumbling with his waistband, and he and another person hurried out of the area together. Shannon was shot in the back from a distance of one-to-two feet by a .45–caliber bullet, which passed through his chest. Shannon died soon after. *Walker* at ¶ 5–7.

. . . At trial, the jury found Walker guilty of aggravated murder, felony murder, and four counts of felonious assault, and the trial court found him guilty of having a weapon while under a disability. Walker appealed to the Eighth District Court of Appeals, arguing that his aggravated murder conviction was not supported by sufficient evidence. The appellate court agreed and concluded that the state had failed to establish that Walker acted with prior calculation and design. *State v. Walker*, 8th Dist. No. 99998, 2014–Ohio–1827, ¶ 21.

. . . The Supreme Court examined "the facts in Walker's case in light of the questions asked in *Taylor*," and found that:

> [I]t appears from the evidence that Walker and Shannon did not know each other, that the killing resulted from a spontaneous eruption of events, and that Walker had not given thought to choosing the murder site. Additionally, Walker did not give thought or preparation to choosing the murder weapon: from his approach to the dance floor at approximately 2:02 a.m. until the fight began at 2:11 a.m., Walker did not move from the area, meaning that the weapon was already on his person before he was even aware of [the animosity between the groups].
>
> *Walker* at ¶ 23.

9

. . . The Supreme Court then reasoned that:

> [T]he videos show an assault that quickly escalated into chaos. For approximately 20 seconds of that chaos, Walker was obscured from the security cameras by a pillar. A jury could reasonably infer that during that time, Walker decided to kill Shannon by shooting him, but it could not reasonably infer that he planned the murder beforehand with prior calculation and design. The element of prior calculation and design requires evidence that supports more than the inference of purpose. Inferring prior calculation and design from an inference of purpose is mere speculation. Accordingly, Walker's conviction for aggravated murder was not supported by sufficient evidence.
>
> *Id.* at ¶ 26.

. . . In the present case, appellant argues, like the appellant in *Walker*, that the element of prior calculation and design was not proven. Appellant argues that he did not give any thought or preparation to choosing the site. Along those same lines, appellant states that this shooting can only be seen as an instantaneous eruption. Therefore, because none of the factors required for prior calculation and design are present, no rational trier of fact could have found that all elements of aggravated murder were proven. As such, appellant alleges that his conviction on the aggravated murder count was based upon insufficient evidence and should be reversed. We disagree.

. . . Our review of the entire record shows that a jury could reasonably find that there was "the presence of sufficient time and opportunity for the planning of an act of homicide to constitute prior calculation, and the circumstances surrounding the homicide show a scheme designed to implement the calculated decision to kill." *Cotton* and *Robbins* at syllabus. We note that the elements of an offense may be established by direct evidence, circumstantial evidence, or both. *See State v. Durr*, 58 Ohio St.3d 86, 92 (1991). Circumstantial and direct evidence are of equal probative value. *See State v. Jenks*, 61 Ohio St.3d 259, 272 (1991). In addition, as the court stated in *State v. Sanders*, 6th Dist. No. L–96–379 (Feb. 13, 1998):

> It is permissible for a jury to draw inferences from the facts presented to them. *State v. Palmer* (1997), 80 Ohio St. 3d 543, 561, 687 N.E.2d 685, citing *Hurt v. Charles J. Rogers Transportation Co.* (1955), 164 Ohio St. 329, 130 N.E.2d 820. The weight given to an inference is a question for the trier of fact and will not be disturbed unless it is such that reasonable minds could not reach such a conclusion. *Id.* at paragraph four of the syllabus.
>
> *Id.* at 7.

. . . In reviewing the factors stated in *Taylor*, unlike *Walker*, it is undisputed that appellant and K.S. knew each other and had been arguing earlier in the evening to the extent that Z.G. shut her bedroom door to avoid hearing them, and they continued arguing during the middle of the night just prior to the shooting. Shortly before the shooting, the victim left the living room area, went upstairs to the second floor of the home, then returned to the living room area, where a jury could infer that the appellant waited for him and immediately shot him multiple times and killed him. Notably, unlike *Walker*, appellant had time to arm himself with a loaded firearm. Also, unlike *Walker* wherein there was only one gun shot, the jury could determine that appellant made a calculated decision to kill K.S., and after shooting him three times, put a gun to his head and shot him execution style in the face. *See Palmer* at 569; *Cotton* at 11; *Carson* at ¶ 24–27.

. . . Certainly a jury could reasonably conclude based on the evidence, i.e., two gunshot wounds to K.S.'s head, a close-range gun shot wound to his face, and a gunshot wound to his body, that appellant made a calculated decision to kill the victim, and that appellant then followed through on his calculated decision. Our review shows that the jury did not clearly lose its way when it found the state's evidence persuasive and did not create a manifest miscarriage of justice. The evidence does not weigh heavily against conviction and appellant presents no persuasive reason for this court to reject the jury's determination. Appellant's third assignment of error challenging the manifest weight of the evidence lacks merit and is overruled.

. . . A finding that a conviction is supported by the manifest weight of the evidence necessarily includes a finding of sufficiency. *State v. McCrary*, 10th Dist. No. 10AP–881, 2011–Ohio–3161, ¶ 11. Therefore, appellant's first assignment of error challenging the sufficiency of the evidence for the aggravated murder conviction is overruled.

*State v. Gamble,* 2017 WL 1476305, at *4–6.

The Fourteenth Amendment's Due Process clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). The question in a sufficiency of the evidence claim is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). The *Jackson* standard must be applied "with explicit reference to the substantive

elements of the criminal offense as defined by state law." *Brown v. Palmer*, 441 F.3d 347, 351 (6th Cir. 2006) (quoting *Jackson*, 443 U.S. at 324 n.16).

When determining if the evidence was sufficient to support a petitioner's conviction, a federal habeas court must view the evidence in the light most favorable to the prosecution. *Wright v. West*, 505 U.S. 277, 296 (1992) (citing *Jackson*, 443 U.S. at 319). The prosecution is not affirmatively required to "rule out every hypothesis except that of guilt." *Id.* (quoting *Jackson*, 443 U.S. at 326). Instead, "a reviewing court 'faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.' " *Id.* at 296–97 (quoting *Jackson*, 443 U.S. at 326).

Moreover, federal habeas courts must afford a "double layer" of deference to state court determinations of the sufficiency of the evidence. As explained in *Brown v. Konteh*, deference must be given, first, to the jury's finding of guilt because the standard, announced in *Jackson*, is whether "viewing the trial testimony and exhibits in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." 567 F.3d 191, 205 (6th Cir. 2009). Second, even if a *de novo* review of the evidence leads to the conclusion that no rational trier of fact could have so found, a federal habeas court "must still defer to the state appellate court's sufficiency determination as long as it is not unreasonable." *Id.*; *see also White v. Steele*, 602 F.3d 707, 710 (6th Cir. 2009). This is a substantial hurdle, one that Petitioner has failed to surmount.

In light of this standard, the state appellate court's decision is not contrary to Supreme Court precedent, an unreasonable application of federal law, or an unreasonable determination of facts. The evidence presented at trial, viewed in the light most favorable to the prosecution, is

sufficient to establish the prior calculation and design element of Ohio's aggravated murder statute.

First, the record contains ample evidence that Petitioner knew the victim and was arguing with him the night he shot the victim. Record evidence established that Petitioner lived in the same multi-story apartment as the victim and slept in the apartment's main-floor living room. (ECF No. 5–1, at PAGE ID ## 214, 215–16, 220, 297.) The victim's niece, who lived in the same apartment, testified that Petitioner and the victim were arguing sometime after dinner on the night of the fatal shooting, and that when she heard them arguing she went upstairs to bed and closed her bedroom door. (*Id*., at PAGE ID # 277.)

The record also contains evidence that the shooting was not immediate. The evidence revealed that the victim and Petitioner separated and the victim was not shot until after he and the Petitioner were in the same room again. Specifically, the victim's nephew, who also lived in the apartment, testified that he was sleeping in a basement bedroom when he was awakened by the sounds of Petitioner and the victim arguing because the victim was attempting to wake Petitioner. (*Id*., at PAGE ID # 225–26.) The victim's nephew further testified that while he was in the basement, he heard someone ascend the stairs from the main floor to the second floor and heard the victim screaming "I will be right back." (*Id*. at PAGE ID ## 226–28.) While still in the basement, the victim's nephew also heard someone descend the stairs from the second floor to the main floor. (*Id*.) The victim's nephew testified that after hearing those footsteps going up and down the stairs between the main and second floors, he went upstairs from the basement to the main-floor kitchen, where he heard three gunshots and saw a flash near the apartment's front door. (*Id*., at PAGE ID ## 228–29.)

The record additionally contains evidence that Petitioner shot the victim in an execution-style fashion. The victim's nephew testified that as he was coming out of the kitchen, he saw the Petitioner holding a handgun "right to [the victim's] face." (*Id.*, at PAGE ID ## 229, 230, 231–33). He then saw another flash and witnessed Petitioner shoot the victim a fourth time in the face. (*Id.*)

On this record, a reasonable jury could have concluded that Petitioner's actions went beyond a momentary impulse. The evidence was therefore sufficient to demonstrate that Petitioner acted with prior calculation and design under Ohio law. Because the evidence was sufficient to establish that element of Ohio's aggravated murder statute under Ohio law, federal habeas relief is not warranted.

## Recommended Disposition

For the foregoing reasons, the Magistrate Judge **RECOMMENDS** that the *Petition* be **DENIED**, and that this action be **DISMISSED**.

## Procedure on Objections

If any party objects to this *Report and Recommendation* ("R&R"), that party may, within fourteen days of the date of this R&R, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A District Judge of this Court shall make a *de novo* determination of those portions of the R&R or specified proposed findings or recommendations to which objection is made. Upon proper objections, a District Judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the Magistrate Judge with instructions. 28 U.S.C. 636(B)(1).

The parties are specifically advised that failure to object to the R&R will result in a waiver of the right to have a District Judge review the R&R *de novo,* and also operates as a waiver of the right to appeal the decision of the District Court adopting the R&R. *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).

DATE: July 8, 2019          */s/ Elizabeth A. Preston Deavers*
                                         **ELIZABETH A. PRESTON DEAVERS**
                                         **CHIEF UNITED STATES MAGISTRATE JUDGE**